UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

THE DOW CHEMICAL COMPANY,

                Plaintiff,                          Case No. 13-14745
                                                        The Honorable Thomas L. Ludington

v.

PABLO DANIEL
SEGISMUN EDELSTEIN,

                Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO QUASH SERVICE AND TO DISMISS**

Pablo Daniel Segismundo Edelstein (Edelstein) was employed by The Dow Chemical Company (Dow)—or one of its affiliates or subsidiary entities—for nearly four decades. During his uninterrupted service from 1975 through 2012, Edelstein worked in Argentina, Switzerland, and Brazil, as well as Florida, California, and Michigan. Relevant to the questions here is the time Edelstein was employed by Dow Brasil (a Dow affiliate) from 2006 through his severance in December 2012. During this period, Edelstein was employed and resided in Sao Paulo, Brazil.

On September 16, 2013, after his severance from Dow, Edelstein filed a lawsuit against Dow Brasil in Brazilian labor court seeking various benefit payments that he claims are "mandatory and required" under Brazilian law. *See* Def.'s Mot. 1, ECF No. 5. Two months later, on November 15, 2013, Dow filed this lawsuit alleging that Edelstein's actions support claims for breach of contract, fraudulent misrepresentation, unjust enrichment, and declaratory judgment. Pl.'s Compl. ¶ 1, ECF No. 1.

In January 2014, Edelstein filed a motion to quash Dow's service of process under Federal Rule of Civil Procedure 12(b)(5). He also moved to dismiss Dow's complaint for lack of personal jurisdiction under Rule 12(b)(2), or—in the alternative—to dismiss on forum non-conveniens grounds. Edelstein's motion will be denied.

## I

Edelstein was born in Argentina and he remains an Argentinian citizen. In March 1975, Dow hired him in Buenos Aires, Argentina, and Edelstein spent the first five years of his career in that location. In January 1980—still employed by Dow or a related entity—Edelstein transferred to Coral Gables, Florida. He then worked in Florida for four years.

In February 1984, Edelstein began the first of two assignments working for Dow in Zurich, Switzerland. Edelstein continued on in Switzerland until he was transferred to Pittsburgh, California in August 1989. Edelstein worked in California until April 1993, when he moved to Dow's corporate headquarters in Midland, Michigan. Edelstein worked for Dow in Michigan until he was again transferred to Zurich in September 2000. He remained in Switzerland until he began his final assignment with a Dow affiliate, Dow Brasil, in September 2006.

## A

In March 2006, Dow offered Edelstein "a temporary assignment . . . as a Global Finance Director for Dow Latin America." Pl.'s Resp. 4, ECF No. 10. According to Dow, "[t]he assignment entailed managing and overseeing the finances of all of Dow's South and Central American subsidiaries and affiliates." *Id.*

In February 2006, before he was officially offered the Brazil position, Edelstein sent an email to Bob Kasprzyk (a Michigan-based Dow employee) concerning "the potential impact of

[Edelstein's] move to Sao Paulo on [his] pension plan status" and to "set up a conference call" to "decide on possible actions."   *See* Feb. 23, 2006 email, *attached as* Pl.'s Resp. Ex. F, at 2. Edelstein indicated in the email that he remained a "US based employee in Dow."   *Id*.

Dow claims that "[f]or nine months, from March through December 2006, Edelstein engaged in protracted negotiations with Dow employees in Midland over the terms of the Letter of Understanding . . . that would govern his Brazil assignment and that is at issue in this case." Pl.'s Resp. 4.   Travel receipts from Dow indicate that in March 2006, and then again in May, Edelstein made trips to Midland, Michigan to discuss the terms of that Letter of Understanding (LOU).   *See* Travel Receipts, *attached as* Pl.'s Resp. Ex. E.   During the second trip, Edelstein met with Janet VanAlsten—Dow's Global Benefits Director—to discuss various benefits he was, or would be, entitled to.   *See* Pl.'s Resp. Ex. D.

After the lengthy negotiations process, and numerous revisions, Edelstein signed the final version of the LOU on December 12, 2006.   *See* LOU 11, *attached as* Pl.'s Resp. Ex. U.   The stated purpose of the LOU was to confirm the terms and conditions that would apply to Edelstein's temporary assignment as Global Finance Director in Sao Paulo, Brazil.   *Id*. at 1. Notably, the LOU also established that upon "completion" of the assignment—which was "expected to be up to 5 years in duration"—Edelstein would return to his "Home Region. . . . The United States."   *Id*.

The LOU outlined the process for Edelstein's pre-assignment preparation, travel to Brazil, his transfer package, and an assistant package for, among other things, housing, furnishings, appliances, and cars while Edelstein lived in Brazil.   *Id*. at 1–7.   Also included were an incentive package, benefits information, and plans for post-employment compensation.   *Id*. at 7–10.   Notably, the LOU indicated that if Edelstein retired from Dow while still participating in

its U.S Post-Employment Compensation scheme, he would remain "eligible for U.S. Retiree medical benefits as well as other benefits as a Dow U.S. retiree." *Id*. at 9.

Dow's Executive Vice President and CFO, Geoffery Merszei, and Edelstein's International Relocation Partner, Mary Mastalerz (now Mary Post[1]), signed the LOU in Midland, Michigan on November 30, 2006. *Id*. at 11. The LOU was sent to Sau Paulo, Brazil, where Edelstein inked his name on December 12, 2006. *Id*.; Post Aff. ¶ 12, *attached as* Pl.'s Resp. Ex. A.

<div align="center">

**B**

</div>

Although Edelstein was assigned to operate in Brazil, he was a member of what Dow refers to as its "Global Leader Family." *Id*. ¶ 4. Global Leaders "such as Mr. Edelstein" are responsible "for managing the subsidiaries and affiliates to which they are assigned, but they continue to have a dual functional reporting obligation to Dow's headquarters in Midland, Michigan." *Id*. Accordingly, Global Leaders "regularly travel to and from Midland," and "continue to receive a U.S. salary and U.S. benefits . . . through DCOMCO, Inc. . . . . a Dow subsidiary with its headquarters and principal place of business in Michigan." *Id*. ¶¶ 4, 5.

In November 2009, William Weideman became Dow's interim Chief Financial Officer (CFO), and in 2010 he was named to his current position of Executive Vice President and CFO. Weideman Aff. ¶ 2, *attached as* Pl.'s Resp. Ex. I. In his affidavit, Mr. Weideman established that Edelstein, in his role as Global Finance Director for Dow Latin America, reported to Mr. Weideman "[f]rom November 2009 until he retired at the end of 2012." *Id*. ¶ 3. According to Mr. Weideman, Edelstein "regularly communicated . . . by phone, email, and in person regarding the financial status of Dow's various subsidiaries and affiliates in Latin America." *Id*. Mr.

---

[1] Mary Mastalerz changed her last name to Post in 2011. Post Aff. ¶ 1, *attached as* Pl.'s Resp. Ex. A.

Weideman also indicated that on August 6, 2012, he met with Edelstein "in Midland, Michigan to discuss [a] project which [Edelstein] organized."  *Id*. ¶ 4.

Edelstein had other contacts with Michigan during his tenure in Brazil.  While working there, he remained an employee of DCOMCO, Inc. (DCOMCO), a Dow subsidiary based in Midland, Michigan.  *See* Pl.'s Resp. Ex. J.  DCOMCO directed Edelstein's W-2 tax forms—from at least 2008 to 2012—to a P.O. Box in Michigan that Edelstein used for correspondence in the United States.  Post Aff. ¶ 15.

Moreover, Edelstein maintained a Michigan driver's license throughout his time in Brazil.  *See* Pl.'s Resp. Ex. K.  Two related driver's license applications—one filed on March 8, 2005, and the other filed on November 25, 2009—indicate Edelstein's address as 1615 Woodpointe Lane, Apt. 2, Midland, MI 48642.  *See id*. at 5, 6.  It appears that Edelstein's Michigan driver's license did not expire until 2013.  *Id*. at 6.

Finally, Edelstein retained Nancy Keppelman, an attorney with Stevenson Keppelman Associates in Ann Arbor, Michigan, to assert "benefits claims" on his behalf after he left Dow's employment.  Jendretzke Aff. ¶ 3, *attached as* Pl.'s Resp. Ex. N.  Specifically, Edelstein asserted claims under several Dow-sponsored deferred compensation plans: the Key Employee Insurance Program, the Elective Deferral Plan, and the International Savings Plan.  *Id*.

### C

According to Mr. Weideman, he had a discussion with Edelstein "[i]n late 2009 or early 2010 . . . regarding [Edelstein's] future at Dow."  Weideman Aff. ¶ 5.  Mr. Weideman indicated that during the discussion, Edelstein explained "that he intended to continue working for Dow for one or two more years and then retire."  *Id*.  Mr. Weideman "again discussed [Edelstein's] retirement plans" in late 2011.  *Id*. ¶ 6.  At that point, Edelstein said "that he intended to retire at

the end of 2012 but wanted to be included in the next force reduction so that he would receive a severance package from Dow to increase his total compensation and enhance his retirement." *Id*. According to Mr. Weideman, "[a]lthough retiring Dow employees do not typically qualify for severance packages," he granted Edelstein's "request to be treated as a severed employee so that he would be eligible to receive those benefits to enhance his retirement." *Id*. ¶ 7. Pursuant to his request, "Dow severed [Edelstein] at the end of 2012 pursuant to a worldwide restructuring program." *Id*. ¶ 8.

As alluded to above, between May and August 2013, Edelstein had his Michigan attorney send Dow four letters advancing claims under "several Dow-sponsored deferred compensation plans—the Key Employee Insurance Program ("KEIP"), the Elective Deferral Plan ("EDP"), and the International Savings Plan ("ISP")." Pl.'s Resp. 7–8. Then, on September 16, 2013, "Edelstein filed suit against Dow Brasil in Brazilian labor court seeking damages in excess of $10 million. In that suit, he contends, among other things, that he is entitled to receive benefits both as a localized Brazilian employee and as a U.S.-based expatriate employee." *Id*. at 8.

### D

Dow filed the present action on November 15, 2013. On December 2, 2013, the Clerk's office sent a FedEx package containing a copy of the Complaint and a summons to Edelstein's residence in Punta Del Este, Maldonado, Uruguay. *See* Dec. 2, 2013 Certificate of Service, ECF No. 3. An individual named N. Perez—who Dow contends is the "front-desk receptionist" for Edelstein's residence in Uruguay, Pl.'s Resp. 8—signed for the package on December 4, 2013. *See* Pl.'s Resp. Ex. O. Edelstein acknowledges that the package was delivered to his residence and signed for by the receptionist of his building, *see* Edelstein Aff. ¶ 10, *attached as* Def.'s Mot. Ex. A, and he does not contest receipt of the package.

Dow also sent a courtesy copy of the Complaint and summons to Edelstein's Michigan Attorney, Ms. Keppelman, on November 15, 2013.  She responded two days later and indicated that although she could not "accept service of process" on Edelstein's behalf because she had only been authorized to represent him "with respect to his claims for benefits," she would "advise Mr. Edelstein that [Dow had] filed a complaint."  Pl.'s Resp. Ex. P.  Dow filed an Amended Complaint on December 17, 2013, and filed a certificate of service as to that complaint on January 13, 2014.  *See* Jan. 13, 2014 Certificate of Service, ECF No. 8.  The certificate indicates that the Amended Complaint was delivered to Edelstein's Uruguay residence, in the same manner as the first complaint.  *Id.*

On January 15, 2014, Edelstein filed his motion to quash service under Federal Rule of Civil Procedure 12(b)(5), and to dismiss under Rule 12(b)(2) or on forum non conveniens grounds.

## II

"In the absence of service of process (or waiver of service by the defendant), a court ordinarily may not exercise power over a party the complaint names as defendant."  *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999) (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)).  Accordingly, "one becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend."  *Murphy Bros.*, 526 U.S. at 350 (citation omitted).  It follows that "without proper service of process, consent, waiver, or forfeiture, a court may not exercise personal jurisdiction over a named defendant[,]" and "in the absence of personal jurisdiction, a federal court is

powerless to proceed to an adjudication." *King v. Taylor*, 694 F.3d 650, 655 (6th Cir. 2012) (internal quotation marks and citations omitted).

Federal Rule of Civil Procedure 4(f) governs the procedure for serving an individual who lives in a foreign country. The rule establishes that "[u]nless federal law provides otherwise," an individual may be served outside of a United States judicial district as follows:

> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;
>
> (2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:
>
>> (A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;
>>
>> (B) as the foreign authority directs in response to a letter rogatory or letter of request; or
>>
>> (C) unless prohibited by the foreign country's law, by:
>>
>>> (i) delivering a copy of the summons and of the complaint to the individual personally; or
>>>
>>> (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or
>
> (3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f).

Dow "bears the burden of establishing that jurisdiction exists" regarding Edelstein's challenge to personal jurisdiction under Rule 12(b)(2). *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) (collecting cases). In the face of a properly supported motion for dismissal, the plaintiff "may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Id.* (citing *Weller v. Cromwell Oil Co.*, 504 F.2d

927, 930 (6th Cir. 1974)).  Notably, "[w]here the court relies solely on the parties' affidavits to reach its decision, the plaintiff must make only a prima facie showing that personal jurisdiction exists in order to defeat dismissal." *Theunissen*, 935 F.2d at 1458–59 (collecting cases).

Moreover, "the pleadings and affidavits submitted on a 12(b)(2) motion are received in a light most favorable to the plaintiff." *Id*. at 1459 (citation omitted).  If a defendant wishes to dispute the plaintiff's factual assertions, that defendant "has recourse to the court's discretionary authority to hold an evidentiary hearing. . . ." *Id*. (citation omitted).  Although Edelstein claims in his reply that Dow attempts "to obfuscate the few key material facts this Court should consider when deciding whether to dismiss the case for lack of personal jurisdiction or forum non-conveniens," Def.'s Reply 3, ECF No. 13, he does not contest any of the facts Dow presents, and his motion will be adjudicated without an evidentiary hearing.  Accordingly, Dow must "make only a prima facie showing that personal jurisdiction exists" to defeat Edelstein's motion under Rule 12(b)(2), which the Sixth Circuit has described as a "relatively slight" burden.  *Estate of Thomson ex rel. Estate of RakeStraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008) (citation omitted).  Where, as here, jurisdiction is predicated upon diversity, the Court "examine[s] the law of the forum state to determine whether personal jurisdiction exists." *Id*. at 361 (citation omitted).  Thus, the law of Michigan governs whether this Court may properly assert personal jurisdiction over Edelstein.

Finally, as to Edelstein's forum non conveniens argument, a dismissal on forum non conveniens grounds "is justified when a defendant establishes that an adequate alternative forum is available and that the public and private factors enumerated in *Gulf Oil* . . . demonstrate that the chosen forum is unnecessarily burdensome to a defendant or a district court." *Zions First Nat. Bank v. Moto Diesel Mexicana, S.A. de C.V.*, 629 F.3d 520, 523 (6th Cir. 2010) (internal

- 9 -

citation omitted).  The relevant public and private factors "include access to witnesses and evidence, availability of compulsory process, cost of obtaining witnesses, administration difficulties for the trial court, local interest in the litigation, and the law applicable to the controversy."  *Id*.  This Court "must apply a strong presumption in favor of a plaintiff's selected forum, particularly if the forum is the home forum of the plaintiff, because 'it is reasonable to assume that this choice is convenient.'"  *Id*. at 523–24 (citation omitted).  Indeed, this deference "permits dismissal only when the defendant establishes such oppressiveness and vexation to a defendant as to be out of all proportion to a plaintiff's convenience, which may be shown to be slight or nonexistent."  *Id*. at 524 (brackets, internal quotation marks, and citation omitted).

### III

Edelstein raises three reasons to dismiss this case: (1) insufficient service of process;[2] (2) lack of personal jurisdiction; and (3) forum non conveniens.  Upon review, however, each argument is without merit, and Edelstein's motion will be denied.

### A

Edelstein first argues that the method Dow utilized to effectuate service of process in Uruguay was legally insufficient because, according to him, "Uruguayan law does not allow for service by mail.  Uruguayan law requires . . . a foreign suit be served by means of letter rogatory addressed to the Uruguayan judicial authorities.  Otherwise, the service is void."  Pl.'s Mot. 9–10.

---

[2] Although Edelstein asserts that "[t]he Court may dismiss plaintiff's complaints for failure to effect service," he also acknowledges that here service is possible "under the law," and therefore he merely requests that the Court "quash the service of process and require [Dow] to adhere to the law in serving him."  Def.'s Mot. 8.  This request comports with the Sixth Circuit's directive when service is insufficient.  *See Etheridge v. Grove Mfg. Co.*, 415 F.2d 1338, 1341 (6th Cir. 1969) ("The order appealed from is affirmed to the extent that it quashes service of process. Since, however, . . . personal service is at least a theoretical possibility, we reverse the dismissal of the complaint"). Accordingly, as it relates to insufficient service of process, Edelstein's motion will be treated as one to quash service rather than one to dismiss Dow's complaint.

As indicated above, Rule 4(f)(1) establishes that an individual may be served "by any internationally agreed means of service that is reasonably calculated to give notice . . . ." Fed. R. Civ. P. 4(f)(1).  Edelstein emphasizes that both the United States and Uruguay are signatories to "the Inter-American Convention," which he claims is "an agreement for service of process between the member countries, including the service of civil summonses and complaints." Def.'s Mot. 8–9.  According to Edelstein, "[t]he Inter-American Convention requires the summons and complaint to be transmitted and certified through the U.S. Central Authority to the designated foreign central authority, which then certifies and issues the documents for service upon the foreign individual."  *Id.* at 9.  To support this contention, Edelstein provides the affidavit of Dr. Richard Raúl Iturria—a lawyer who has been practicing in Uruguay since his admission in 1998.  Iturria Aff. ¶ 2, *attached as* Def.'s Mot. Ex. C.  Like Edelstein, Dr. Iturria claims that "[t]he Inter-American Convention requires an Uruguayan defendant in a foreign suit be served by means of letter rogatory processed through Uruguayan government authorities."  *Id.* ¶ 6.  So, according to Edelstein, because the United States and Uruguay are signatories to this convention, service upon him was required to be effected through letters rogatory.

But this is not so; federal courts addressing the issue have established that the Inter-American Convention on Letters Rogatory[3] (Inter-American Convention) does not furnish the "exclusive means for serving process in signatory countries."  *Russell Brands, LLC v. GVD Intern. Trading, SA*, 282 F.R.D. 21, 24 (D. Mass. 2012) (citation omitted).  In *Kreimerman v. Casa Veerkamp, S.A. de C.V.*, 22 F.3d 634 (5th Cir. 1994), the Fifth Circuit addressed whether the Inter-American Convention requires service by letters rogatory.  There, an American plaintiff attempted service on residents of Mexico by direct mail.  Because both the United States and

---

[3] Inter–American Convention on Letters Rogatory, January 30, 1975, S. TREATY DOC. No. 27, 98th Cong., 2d Sess. (1984).

Mexico are signatories, the Fifth Circuit addressed whether service by direct mail was foreclosed by the Inter-American Convention.  In concluding that it was not, the court established that the Inter-American Convention "does not expressly prohibit" means of service other than letters rogatory and instead indicated that the Inter-American Convention's "scope appears to be limited to regulating . . . one procedural mechanism."  *Id*. at 639, 640.  In other words, the court concluded that the Inter-American Convention "merely provides a mechanism for transmitting and delivering letters rogatory when *and if* parties elect to use that mechanism."  *Id*. at 642 (emphasis added).

When addressing the issue, federal courts in Michigan have followed suit.  In *Elcometer, Inc. v. TQC-USA, Inc.*, No. 12-14628, 2013 WL 592660 (E.D. Mich. Feb. 14, 2013), this Court addressed service on defendants in Panama, "a party to the Inter-American Convention . . . ." *Id*. at *2.  The Court concluded that "[t]he Inter-American Convention, unlike the Hague Convention, does not purport to provide the exclusive means of effective service of process between the signatories."  *Id*. (citation omitted).  In *C & F Sys., LLC v. Limpimax, S.A.*, 75 Fed. R. Serv. 3d 956 (W.D. Mich. 2010), a court in the Western District of Michigan reached the same conclusion: "the Inter-American Convention does not purport to provide the exclusive method of effective service" but instead "allow[s] other means of service . . . ."  *Id*. at *1, *2. *See also Pizzabiocche v. Vinelli*, 772 F. Supp. 1245, 1249 (M.D. Fla. 1991) ("The Inter-American Convention states that it shall apply to letters rogatory; it does not state that letters rogatory are the only means of serving process in the signatory countries.").  Accordingly, the Inter-American Convention does not *require* that a defendant in Uruguay be served by letters rogatory.

And because the Inter-American Convention "allows but does not specify other means" of service, an individual may be served—unless prohibited by the foreign country's law—as follows: "(i) delivering a copy of the summons and of the complaint to the individual personally; or (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt."  Fed. R. Civ. P. 4(f)(2)(C).  Because it is uncontested that Dow delivered a copy of the summons and complaint to Edelstein's building and required a signed receipt, service was proper so long as that method is not prohibited by Uruguayan law and was otherwise "a method that is reasonably calculated to give notice."  Fed. R. Civ. P. 4(f)(2).

Edelstein argues that "Uruguayan law does not allow for service by mail.  Uruguayan law requires a Uruguayan defendant in a foreign suit be served by means of letter rogatory addressed to the Uruguayan judicial authorities."  Def.'s Mot. 9–10.

As far as this argument applies to purely domestic cases, Edelstein is correct: even Dow admits that "Uruguayan courts do not recognize service of process by registered mail in Uruguayan cases . . . ."  Pl.'s Resp. 11; *see also* Brandes Aff. ¶ 10, *attached as* Pl.'s Resp. Ex. T.  But as Dow correctly notes, neither have Uruguayan courts "expressly prohibit[ed] service by mail."  Pl.'s Resp. 11 (emphasis omitted).  Edelstein relies on "Article 526 of Uruguay's General Code of Process" to support his argument that Uruguayan law "plainly requires a foreign court to use letters rogatory to effect service."  Def.'s Resp. 4.  But this is a tortured rendition of that subsection of the Uruguayan Code.  In pertinent part, Article 526 reads (in English) as follows:

> Article 526. Rules of Procedure.
> 526.1  The courts shall issue letters rogatory [*exhortos* and *cartas rogatorias*\*] to undertake merely procedural formalities abroad, such as notices, summonses, or subpoenas, as well as to receive and obtain evidence and reports.
> The same solution shall be used in respect of letters rogatory originating from foreign courts.

Pl.'s Resp. Ex. S.  So Article 526 establishes that Uruguayan courts will issue letters of rogatory in order to effect service abroad, and the same method "in respect of letters rogatory originating from foreign courts."  *Id*.  Notably, however, Article 526 does not require foreign plaintiffs to effectuate service on Uruguayan defendants by letters rogatory.  Edelstein's formulation—that Article 526 "says 'the same solution shall be used' *for service originating from a foreign country*," Def.'s Resp. 4 (emphasis added)—distorts the subsection's language to make it applicable to *service* originating in foreign countries, not merely "letters rogatory" as mentioned in the Uruguayan Civil Procedure Code.

In addition, Article 77 of the Uruguayan Code governs "Forms of Service."  *See* Pl.'s Resp. Ex. S.  It establishes that service by mail is a recognized method of service in Uruguay: "Notice shall be served . . . if applicable, by mail . . . ."  *Id*.  And Article 80 provides for "Service by Court Mail."  *Id.*

Because Uruguayan law does not expressly prohibit service on defendants in international cases by certified mail, such a method is permissible under Rule 4(f) so long as that method "is reasonably calculated to give notice."  Fed. R. Civ. P. 4(f)(2).  The method Dow employed—certified mail with a signature requirement—complies with this requirement.

Due process requires that service provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *LSJ Inv. Co., Inc. v. O.L.D., Inc.*, 167 F.3d 320, 323 (6th Cir. 1999) (citation omitted).  Because "[t]he mails are an efficient an inexpensive means of communication that generally may be relied upon to deliver notice where it is sent[,]" the Supreme Court "has consistently held that mailed notice satisfies the requirements of due process."  *Weigner v. City of New York*, 852 F.2d 646, 650 (2d Cir. 1988) (internal quotation

marks and citations omitted).  In *Weigner*, although the Second Circuit established that first class mail was "sufficient" to provide notice, *id*. at 651, it made clear that "notice by certified mail" requiring a "signed receipt would provide virtually conclusive evidence that the notice was received," and thus this method aligns with the notions of due process.  *Id*. at 650.

In this case, it is not disputed that Dow delivered a copy of the summons and complaint, via certified mail, to Edelstein's residence in Uruguay.  It is also not disputed that the front-desk receptionist of Edelstin's building signed for the package on December 4, 2013, and that he subsequently received it.  In fact, Edelstein responded to the complaint with a motion to quash service, and to dismiss, little more than one month later.

Accordingly, because Uruguayan law does not prohibit service on a Uruguayan defendant in an international case by certified mail requiring a signature, and because such notice is "reasonably calculated . . . to apprise interested parties of the pendency of the action"—and indeed did so here—Dow's service of process on Edelstein complies with Rule 4(f) and will not be quashed.

## B

The next question is whether this Court may assert jurisdiction over Edelstein once he has been properly served.  Because of his compelling contacts with the state of Michigan, personal jurisdiction over Edelstein is proper in this Court.

As indicated above, Dow has the burden of establishing the existence of jurisdiction.  *Air Prods. & Controls, Inc. v. Safetech Intern., Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (citation omitted).  Because the issue is being resolved without limited discovery or an evidentiary hearing, Dow's burden is "relatively slight," requiring it only to make out "a prima facie showing that personal jurisdiction exists . . . ."  *Id*. (citations omitted).  Further, in such

circumstances, "the pleadings and affidavits submitted must be viewed in a light most favorable to the plaintiff, and the district court should not weigh the controverting assertions of the party seeking dismissal." *Id*. (internal quotation marks and citation omitted).

Personal jurisdiction over an out-of-state defendant arises from "certain minimum contacts with the forum such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id*. (internal quotation marks and citation omitted). In a diversity case such as this one, "the exercise of personal jurisdiction is valid only if it meets both the state long-arm statute and constitutional due process requirements." *Children's Legal Servs., PLLC v. Shor Levin and Derita, PC*, 850 F. Supp. 2d 673, 679 (E.D. Mich. 2012) (brackets and citation omitted). Notably, the Sixth Circuit has explained that "where the state long-arm statute extends to the limits of the due process clause, the two inquiries are merged and the court need only determine whether exercising personal jurisdiction violates constitutional due process." *Id*. (brackets omitted) (quoting *Bridgeport Music, Inc. v. Still N. the Water Publ'g*, 327 F.3d 472, 477 (6th Cir. 2003)). The Sixth Circuit has historically "understood Michigan to intend its long-arm statute to extend to the boundaries of the fourteenth amendment." *Theunissen*, 935 F.2d at 1462; *see also* Def.'s Mot. 11 ("the Michigan long-arm statute is generally interpreted to reach to the limits of due process.").[4]

Personal jurisdiction "can either be specific or general."[5] *Air Prods.*, 503 F.3d at 549–50 (citation omitted). If specific jurisdiction is present, there is no need to reach the question of

---

[4] Even if Michigan's long-arm statute must be satisfied independently of due process considerations, it would be satisfied here. Michigan's long-arm statute allows limited personal jurisdiction over individuals if the individual conducts "[t]he transaction of *any* business within the state." Mich. Comp. Laws § 600.705(1) (emphasis added). The Michigan Supreme Court has explained that the word "any" in this context "means just what is says. It includes 'each' and 'every.' It comprehends 'the slightest.'" *Sifers v. Horen*, 188 N.W.2d 623, 624 n.2 (Mich. 1971). That Edelstein conducted "the slightest" transaction of business within Michigan cannot seriously be doubted.

[5] General jurisdiction exists "in cases in which a defendant's 'continuous and systematic' conduct within the forum state renders that defendant amenable to suit in any lawsuit brought against it in the forum state," and specific

general jurisdiction. *Id.* at 550. Dow asserts in its response that only specific jurisdiction is at issue here, *see* Pl.'s Resp. 12, and Edelstein's motion is similarly constricted to analysis of specific jurisdiction under due process, *see* Def.'s Mot. 11 ("Considering the due process analysis, the Sixth Circuit sets forth the following three-part test to determine whether specific jurisdiction exists"). The Court's analysis will be similarly constrained.

And as Edelstein notes, the Sixth Circuit has established a three part test for determining whether specific jurisdiction comports with due process requirements:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Air Prods.*, 503 F.3d at 550 (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). Of these three requirements, the Sixth Circuit "views the purposeful availment prong . . . as 'essential' to a finding of personal jurisdiction." *Intera Corp. v. Henderson*, 428 F.3d 605, 616 (6th Cir. 2005) (citation omitted). If the first two elements are met, an "inference of reasonableness arises" and "only the unusual case will not meet th[e] third criterion." *Theunissen*, 935 F.2d at 1461 (citation omitted).

**1**

Edelstein purposefully availed himself of the benefits and protections furnished by Michigan. "Purposeful availment" occurs when "the defendant's contacts with the forum state proximately result from actions by the defendant himself that create a substantial connection with the forum state." *Children's Legal*, 850 F. Supp. 2d at 681 (internal quotation marks

---

jurisdiction exists "in cases in which the subject matter of the lawsuit arises out of or is related to the defendant's contacts with the forum." *Nationwide Mut. Ins. Co. v. Tryg. Intern. Ins. Co., Ltd.*, 91 F.3d 790, 793 (6th Cir. 1996) (citations omitted).

omitted) (quoting *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 889 (6th Cir. 2002)). Where parties "reach out beyond one state and create continuing relationships and obligations with citizens of another state," those parties "are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (collecting cases).

Dow has carried its burden of demonstrating that Edelstein purposefully availed himself to suit in Michigan through substantial connection with the state. In 2006, he twice visited Midland, Michigan while negotiating the terms of his LOU. He visited again in August 2012. As the Supreme Court noted in *Burger King*, "territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there . . . ." *Id*. at 476.

Moreover, Edelstein's position with Dow Brasil—and his status as a part of Dow's "Global Leader Family"—created a "dual functional reporting obligation to Dow's headquarters in Midland, Michigan." Post. Aff. ¶ 4. Such continuing relationships and obligations support the assertion of personal jurisdiction. *See Burger King*, 471 U.S. at 473. Edelstein also often initiated contact with Michgan-based Dow employees to discuss the terms of his continuing employment. He also received much of his salary from a Michigan-based Dow subsidiary (DCOMCO), and his W-2 tax documents were delivered to a local P.O. Box that he maintained in Michigan. And when he wished to assert benefits claims against Dow, Edelstein retained local counsel from Ann Arbor, Michigan.

Finally, and of great import, Edelstein maintained a Michigan driver's license throughout his employment in Sau Paulo, Brazil. In November 2009, Edelstein personally traveled to

Michigan to renew that license, and the application he submitted represented that he maintained a Michigan residence. *See* Pl.'s Resp. Ex. K, at 6.

Edelstein's contacts with Michigan formed a substantial connection with the state; those contacts support a finding that he purposefully availed himself of the benefits and protections of Michigan.

## 2

Not only did Edelstein avail himself to the possibility of suit in Michigan, the present litigation arose from his activities there, and the second prong of the test establishing specific jurisdiction is satisfied.

The "arising from" prong is satisfied "when the operative facts of the controversy arise from the defendant's contacts with the state." *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723 (6th Cir. 2000) (citation omitted). "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contract." *Id*. at 723–24.

The Sixth Circuit has imposed a "lenient" threshold for meeting the "arising from" requirement. *Fortis Corp. Ins. v. Viken Ship Mgmt.*, 450 F.3d 214, 222 (6th Cir. 2006) (citation omitted). As such, all that is required is "the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities." *Id*. (internal quotation marks and citation omitted).

Here, as in *Fortis*, the operative facts are—at the very least—"marginally related" to Edelstein's contacts with Michigan. *See id*. at 223. The entire purpose of his 2006 visits to the state were to negotiate the terms of his LOU. The numerous emails and telephone calls Edelstein directed to Michigan-based Dow employees also related to his LOU. And Dow's first claim of

action is that Edelstein breached "a valid contract, the LOU . . . ."  Pl.'s Am. Compl. ¶ 88, ECF No. 4.  The Sixth Circuit has recognized "that a breach of contract action arises from the defendant's contact with the state because the contract is necessarily the very soil from which the action for breach grew."  *Calphalon*, 228 F.3d at 724 (internal quotation marks and citation omitted).

Count II of Dow's complaint alleges that Edelstein breached its "Code of Business Conduct" when he submitted annual certifications attesting to his compliance with Dow's expectations for ethical business conduct.  Pl.'s Am. Compl. ¶¶ 95–103.  Edelstein submitted these certifications directly to Dow's headquarters in Midland, Michigan, and the certifications were required "[i]n exchange for [Edelstein's] continued employment by Dow."  *See* Pl.'s Resp. 18.  This claim, then, also arises out of Edelstein's continued contacts with the state.

Dow's third claim involves breach of contract as it relates to equity-award agreements.  *See* Pl.'s Am. Compl. ¶¶ 106–116.  Because this claim involves the same conduct that constitutes the basis of Counts I and II, this third claim also arises out of Edelstein's contacts with Michigan.

The same is true of Dow's fourth and fifth claims, which involve fraudulent misrepresentation.  In Count IV, Dow asserts that Edelstein made material, false representations on the previously-mentioned annual certifications, and that those misrepresentations were made directly to Dow employees in Michigan.  *Id*. ¶¶ 119–134.  With Count V, Dow asserts that in asking to be severed as opposed to simply retiring, Edelstein "intended to seek severance under Dow's U.S. Severance Plan *and* under Brazilian law," which apparently was contrary to his entitlement under the LOU.  *Id*. ¶¶ 138, 139 (emphasis added).  Because—based on a view of the evidence that favors Dow—Edelstein "purposefully direct[ed] communications into" the state of Michigan (the annual certificates and discussions concerning retirement with Mr. Weideman),

- 20 -

and because "those communications form the 'heart'" of Dow's fourth and fifth claims, these claims also arise out of Edelstein's contacts with Michigan. *See Neal v. Janssen*, 270 F.3d 328, 333 (6th Cir. 2001).

In Count VI, Dow asserts (in the alternative) that Edelstein has been unjustly enriched by his conduct. *See* Pl.'s Am. Compl. ¶¶ 143–45. Dow claims that "through fraudulent means," Edelstein has "extracted and continues to pursue . . . significant amounts to which he is not entitled . . . ." *Id.* ¶ 143. Again, because the alleged fraudulent communications were directed toward employees located in Michigan, this claim arises out of Edelstein's contacts with the state. *See Neal*, 270 F.3d at 333. Finally, Dow's seventh claim—for declaratory judgment—is intertwined with each of Dow's other claims, and therefore it (just as with those other claims) arises out of Edelstein's contacts with Michigan. The second due process requirement for asserting specific personal jurisdiction over Edelstein has been duly satisfied.

**3**

When the first two prongs of the specific jurisdiction test are satisfied, an "inference of reasonableness arises" and "only the unusual case will not meet th[e] third criterion." *Theunissen*, 935 F.2d at 1461 (citation omitted). This is not the "unusual case" in which it would be unreasonable to assert jurisdiction over Edelstein.

In the Sixth Circuit, courts determine the reasonableness of exercising personal jurisdiction over a defendant by weighing several factors, including "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the controversy." *Intera Corp.*, 428 F.3d at 618 (citation omitted).

Although Edelstein would be burdened if compelled to litigate this case in Michigan given the fact that he does not currently reside there, specific jurisdiction can be "proper even when a defendant would be compelled to travel." *Id*. (citation omitted). And, because Dow is a Michigan corporation, Michigan has "a strong interest in exercising jurisdiction" in this case because states "have an interest in 'protecting [their] residents' legal options.'" *Id*. (quoting *Youn v. Track, Inc.*, 324 F.3d 409, 419 (6th Cir. 2003)). Indeed, that Edelstein hired a Michigan lawyer to assert benefits claims against Dow certainly increases the likelihood that he could have reasonably expected to be haled into a Michigan court, based on his relationship with Dow, to resolve similar issues.

It is quite clear that Dow has a substantial interest in obtaining relief; this factor also weighs in favor of exercising personal jurisdiction. The final factor, another states' interest in securing efficient resolution of this matter, does not appear to weigh in either party's favor.

Edelstein argues that this case is similar to *Whirlpool Corp. v. King*, 298 F. Supp. 2d 687 (W.D. Mich. 2003), where the plaintiff's previous contacts with Michigan did not make suit there reasonable because the plaintiff's "work performance at issue occurred entirely overseas . . . she reside[d] in Italy, and . . . she ha[d] not been to Michigan since 1995 . . . ." *Id*. at 690. Thus, the court concluded, the plaintiff's "connections with Michigan appear to be insubstantial and exercise of personal jurisdiction over her is arguably unfair and unreasonable." *Id*.

The same is not true here. Edelstein's work performance did not occur entirely overseas: he regularly reported to Dow employees in Michigan. He also frequently visited Michigan during the course of that employment. He held a driver's license in Michigan and maintained a legal residence there—at least into early 2013. And he retained counsel within the state. These connections with Michigan are not limited or insubstantial, and—unlike the plaintiff in

*Whirlpool*—the exercise of personal jurisdiction over Edelstein is anything but unfair or unreasonable.

Dow has carried its burden of establishing that the exercise of specific, personal jurisdiction over Edelstein comports with due process (and, to the extent that it is relevant, Michigan's long-arm statute). Edelstein's motion to dismiss based on Rule 12(b)(2) will be denied.

### C

With his final argument, Edelstein indicates that even if jurisdiction is proper in this Court, the case should be dismissed on forum non conveniens grounds. This argument is also without merit.

Forum non conveniens is a common law doctrine which the Supreme Court imported into the federal courts with *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947). The doctrine permits a federal court to dismiss a case over which it has jurisdiction and in which venue is otherwise proper when dismissal would "best serve the convenience of the parties and the ends of justice." *Koster v. American Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 527 (1947). The Doctrine "presupposes at least two forums in which the defendant is amendable to process"—the chosen federal court on the one hand and either an alternative state court or a court of a foreign country on the other—and "furnishes criteria for choice between them." *Gulf Oil*, 330 U.S. at 506–07.

Even assuming that Brazil is an adequate forum for this dispute, the forum non conveniens issue can be resolved under the criteria furnished by the Supreme Court in *Gulf Oil*. As far as these criteria go, "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235,

255 (1981).   As noted above, this deference "permits dismissal only when the defendant establishes such oppressiveness and vexation to a defendant as to be out of all proportion to a plaintiff's convenience, which may be shown to be slight or nonexistent."  *Moto Diesel*, 629 F.3d at 523 (internal citation omitted)

Beyond the plaintiff's forum choice, the Supreme Court has set out a list of private and public interest factors that this Court must weigh in determining whether dismissal based on forum non conveniens is proper. The private interest factors relate to the convenience of the litigants themselves and include: (1) the relative ease of access to proof; (2) availability of compulsory process for attendance of unwilling witnesses and the cost of obtaining the attendance of willing witnesses; (3) possibility to view the premises (when relevant); (4) enforceability of a judgment if one is obtained; and (5) "all other practical problems that make trial of a case easy, expeditious and inexpensive."  *Gulf Oil*, 330 U.S. at 508.  The public interest factors, meanwhile, include: (1) preventing congestion of the court's docket; (2) the interest in having localized controversies decided at home; (3) the appropriateness of trying a case in a forum that is at home with the law that must govern the case; (4) the avoidance of unnecessary problems in conflict of laws, or in the application of forum law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty.  *Id.*; *see also Banco De Serguros Del Estado v. J.P. Morgan Chase & Co.*, 500 F. Supp. 2d 251, 259–60 (S.D.N.Y. 2007).  In the end, however, it is important to remember that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."  *Gulf Oil*, 330 U.S. at 508.

Here, the balance does not favor Edelstein so as to overcome Dow's home forum.  Dow is a Delaware corporation "having its principal place of business in Midland, Michigan."  Pl.'s Am. Compl. ¶ 14.  Thus, because Dow has filed suit in what is its "home forum," that choice can

only be disturbed if Edelstein demonstrates "oppressiveness and vexation . . . as to be out of all proportion to a plaintiff's convenience . . . ."  *Moto Diesel*, 629 F.3d at 523 (internal citation omitted).

Edelstein has not demonstrated that litigating this case in Michigan would be so oppressive, so vexatious, that such a course would be "out of all proportion" to his convenience. Edelstein is no stranger to Michigan; he has visited Michigan many times over the years.  He lived in Michigan from 1993 to 2000.  While living and working in Brazil, Edelstein maintained a residence in Michigan and held a valid Michigan driver's license.  Indeed, when he wished to assert claims against Dow, Edelstein did not hesitate to hire a Michigan attorney to pursue those claims.

Moreover, Dow asserts that "most of the evidence and witnesses that would be produced at trial reside in Michigan—not Brazil."  Pl.'s Resp. 25.  This seems to be borne out by the exhibits attached to the parties' respective briefs.  Edelstein's motion to dismiss includes his affidavit, as well as declarations from two international lawyers concerning the intricacies of Brazilian and Uruguayan law.  He does not identify any witnesses—aside from himself—that have personal knowledge of this case and would find Brazil more accessible than Michigan.

Dow, on the other hand, relies on the testimony of numerous individuals that have personal knowledge of this case and reside in Michigan: Mary (Mastalerz) Post; William Weideman; Marianne Besaw; and Bryan Jendretzke.  *See* Pl.'s Resp. Exs. A, I, L, and N.  And it appears that Dow's claims against Edelstein—which involve a contract that was negotiated, at least in part, in Michigan—would be conveniently litigated in Michigan.  Thus, the private interest factors set forth in *Gulf Oil* weigh in favor of keeping this case in this Court.

As do the public interest factors enumerated by the Supreme Court.  It appears, at this preliminary juncture, that the law governing Dow's claims will be the law of Michigan—not the law of Brazil.  *See Steelcase, Inc. v. Mar-Mol Co., Inc.*, 210 F. Supp. 2d 920, 941 (W.D. Mich. 2002) ("In general, the court that sits in the state whose substantive law will govern the case is in the best position to apply that state's laws.").  Further, Michigan maintains an interest in providing a forum for one of its own corporations to seek redress for breaches of contracts that were negotiated in the state.  *See Intera Corp.*, 428 F.3d at 618 (citation omitted).

Considering all the factors relevant to dismissing the action on forum non conveniens grounds, private and public alike, the Court finds no single factor, or combination thereof, that tips the balance in favor of transferring the case to Brazil.  Dow's choice of forum is entitled to substantial weight—particularly when Dow chooses its home forum, *see Steelcase*, 210 F. Supp. 2d at 941—and Edelstein has not demonstrated that adjudicating this case in Michigan would be substantially more inconvenient than doing so in Brazil.

**IV**

Accordingly, it is **ORDERED** that Edelstein's motion to quash service and to dismiss, ECF No. 5, is **DENIED**.

Dated: March 28, 2014

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

<div style="border:1px solid">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 28, 2014

s/Tracy A. Jacobs
TRACY A. JACOBS

</div>